EL PUEBLO, DEMANDANTE Y APELADO, *v.* LANAUSSE, ACUSADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Guayama en causa por homicidio voluntario.

No. 1818.—Resuelto en junio 2, 1922.

JUICIO—FORMACIÓN DEL JURADO.—La ley no requiere la presencia de un *panel* completo de veinticuatro jurados para que pueda seleccionarse de entre ellos los doce que han de juzgar al acusado.

ID.—ID.—RECUSACIÓN DEL JURADO EN TOTALIDAD.—Agotado el panel ordinario y citados *panels* especiales no procede una impugnación general atacando la formación del jurado fundada en que todas las personas sorteadas no fueron citadas; y el hecho de que la defensa hubiera agotado o no las recusaciones perentorias no altera la regla, si bien en algunos casos tal circunstancia podría ser importante para hacer que la corte sea más liberal en la consideración de recusaciones generales.

ID.—ID.—ABUSO DE DISCRECIÓN.—Para que exista abuso de discreción, o debe aparecer terminantemente de los autos que se ha cometido alguna injusticia con el acusado, o ser ésta una inferencia necesaria de los autos.

ID.—HOMICIDIO—INSTRUCCIÓN SOBRE HOMICIDIO JUSTIFICABLE.—En un caso de homicidio una vez demostrado que el acusado hizo el disparo mortal el acusado tiene por lo menos el deber de mostrar a la corte que hay alguna prueba real tendente a establecer que el homicidio que de otro modo sería un homicidio involuntario era justificable. Y el hecho de que la prueba revele meramente la posibilidad de que el acusado disparó justificadamente no da derecho a una instrucción sobre homicidio justificable.

ID.—HOMICIDIO—EVIDENCIA—REPUTACIÓN DEL INTERFECTO.—Cuando no hay prueba de defensa propia o de que el homicidio era justificable, no procede admitir prueba de la reputación del interfecto como hombre peligroso.

Los hechos están expresados en la opinión.

Abogados del apelante: *Sres. L. Tormes* y *R. Martínez Nadal.*

Abogado del apelado: *Sr. José E. Figueras, Fiscal.*

EL JUEZ ASOCIADO SR. WOLF, emitió la opinión del tribunal.

Este es otro de los muchos casos en el cual el apelante

ha dejado de presentar un señalamiento de errores por se-
parado como lo exigen las reglas 42 y 43 del Reglamento de
esta corte.   Ni en ellos se hacían tampoco una exposición
concisa de los hechos.   No existe tentativa para resumir la
prueba.

Se trata de un apelante a quien se imputó un delito de
asesinato y fué declarado culpable de homicidio voluntario.
Al comienzo del juicio presentó una moción de traslado fun-
dada al parecer en que existía un fuerte prejuicio en Gua-
yama contra el acusado debido a la contienda política que
fué causa de varias muertes violentas según revelan los au-
tos.   Esta moción de traslado fué denegada por la corte y
su negativa no ha sido materia de un señalamiento de error.
La fuerte presunción de que los ciudadanos de su misma lo-
calidad harán justicia a un acusado persistiría, después de
la desestimación de una moción de traslado, pero no hay nada
en ninguna parte de los autos como no sean las manifesta-
ciones hechas por un jurado suplente que justifique la teoría
de que había tal prejuicio en Guayama contra el apelante.
El mero hecho de que los ánimos estaban exitados en época
de elecciones no justifica al abogado en suponer que en el
momento decisivo de un juicio los ciudadanos no cumplirán
con sus deberes como jurados.   Además, no hay nada que
demuestre la naturaleza particular del jurado que juzgó al
acusado, ni tampoco los abogados en su moción de nuevo jui-
cio, o en otra forma probaron que alguno de los jurados ele-
gidos tenía prejuicios, o siquiera que algún jurado tenía en
realidad distinta filiación política a la del apelante.   Deci-
mos esto por vía de introducción porque en el argumento
del primer señalamiento de error da por sentado el abogado
sin justificación alguna que en cierto modo o en alguna parte
realmente existió cierto prejuicio.

El primer señalamiento trata de la desestimación por la
corte de una moción presentada por el acusado a manera
de una recusación atacando la formación del jurado y más

especialmente la forma en que fueron llamadas dos listas extraordinarias de jurados en totalidad (*panels*), después de agotados los primeros *panels* regulares. Este agotamiento tuvo lugar en la mañana de cierto día y se ordenó al marshal tener listos dos nuevos *panels* para las dos de la tarde, citando, de ser necesario, a los jurados suplentes de los distritos distantes por el teléfono y el telégrafo. A las dos de la tarde, no obstante, sólo comparecieron siete jurados suplentes, de los cuales cuatro eran del primer *panel* especial y tres del segundo *panel* especial. Estos siete nombres fueron colocados en la urna por el secretario y entonces se hizo contestar a cada uno de los jurados en el examen preliminar para determinar su competencia (*voir dire*), sin objeción alguna inmediata por parte del acusado de que la lista era incompleta. Fué solo después que el jurado estaba al parecer completo que se hizo la recusación a todo el jurado. Alegando el apelante que los jurados suplentes de Aibonito, Barranquitas y Cidra no fueron citados se queja de que el sorteo hecho y la constitución del jurado en esta forma era completamente irregular y nulo. Examinado el marshal declaró que era imposible para él dentro del tiempo indicado tener reunidos a los otros jurados suplentes ante la corte oportunamente.

Los artículos 201, 202 y 212 del Código de Enjuiciamiento Criminal prescriben lo siguiente:

"Artículo 201.—Tan pronto como haya recibido la lista de los jurados designados por la suerte, el oficial del tribunal citará a los respectivos individuos para que comparezcan ante el tribunal en el día y hora fijados en la providencia, dejando copia de la notificación a dicho efecto en el domicilio de los jurados o haciéndola personalmente a cada uno de ellos; luego devolverá la lista al tribunal expresando los nombres de los que han sido citados y la forma en que se ha hecho la citación."

"Artículo 202.—Si no concurriese un número suficiente de jurados debidamente sorteados y notificados, o no se pudieren obtener, en opinión de los jueces, sin gran dilación o gastos para la forma-

ción del jurado, el tribunal si lo estima procedente, puede ordenar al secretario que a presencia del propio tribunal extraiga de la urna los nombres de tantas personas como dicho tribunal crea suficientes para aquel objeto.''

  *     *     .*     *     *     *     *

 ''Artículo 212.—Sólo puede fundarse la recusación de todo el jurado en que los procedimientos se hayan desviado considerablemente de las prácticas prescritas para el sorteo y formación de la lista de jurados, o en que se haya omitido citar intencionalmente a uno o más de los jurados sorteados.''

 La interpretación de estos artículos ha estado ante la corte en varios casos, a saber, el de *El Pueblo* v. *Morales,* 14 D. P. R. 234; *El Pueblo* v. *Vázquez,* 20 D. P. R. 365; *El Pueblo* v. *Pillot,* 20 D. P. R. 376, y *El Pueblo* v. *Juliá,* 25 D. P. R. 258. En el primero de estos casos resolvimos después de detenida consideración, siendo ponente el Juez Sr. McLeary, que la ley no da al acusado el derecho a solicitar que un *panel* completo de veinte y cuatro jurados pudiera obtenerse antes de procederse a sortear los doce jurados que debían juzgar la causa, y que la citación depende necesariamente de las exigencias del caso, de la residencia de las personas y habilidad del marshal para encontrarlas a tiempo sin demorar los asuntos de la corte; que para que un juicio pueda terminarse la corte no debe estar sujeta a las demoras de tener que citar todo el *panel.* En otras palabras que la formación del *panel,* es cuestión que descansa grandemente en la sana discreción de la corte sentenciadora como se expuso en los casos de Vázquez, Pillot y Juliá, *supra.* Llama la atención el abogado hacia el hecho de que en el caso de Morales y en otros, la defensa no agotó sus recusaciones perentorias y que esta omisión desempeñaba y desempeña un papel en la decisión de las cortes. El fundamento de la decisión (*ratio decidendi*) del caso de Morales no dependía del agotamiento de las recusaciones, si bien en algunos casos podemos ver cómo ese hecho podría ser importante para hacer

que la corte sea más liberal en la consideración de recusa-
ciones generales.

El abogado admite que la jurisprudencia muestra que la
aceptación de estos jurados suplentes estaba dentro de la
sana discreción de la corte sentenciadora, pero alega un abuso
de discreción que depende en su esencia de la supuesta exis-
tencia de prejuicio en Guayama y particularmente en las re-
giones del llano a diferencia de las montañas, como por ejem-
plo, Aibonito, Barranquitas y Cidra. Hemos hecho mención
de que el único hecho de los autos al cual han llamado la
atención los abogados como que tiende a demostrar un pre-
juicio existente fué la declaración de un jurado suplente.
Dijo que no tenía conocimiento personal del caso y se le pre-
sentó entonces una petición a la cual él se había unido para
pedir un traslado basado en que no podía obtenerse un ju-
rado en el distrito que estuviera libre de prejuicios. Dijo
bajo juramento que firmó la petición sin verla. La corte lo
excusó. Era evidente que él no fué un jurado apropiado.
Pero también se deja ver que en la petición se alegó que
no podía encontrarse en el distrito un jurado que estuviera
libre de prejuicios. De ahí que el citar personas de Aibo-
nito, Barranquitas y Cidra, que también forman parte del
distrito, de poco serviría al acusado. No encontramos, ade-
más, en los autos ninguna tentativa por recusar específica-
mente a los jurados del llano debido a algún alegado pre-
juicio. No se intentó hacer recusación motivada a algún ju-
rado por residir en la ciudad de Guayama u otra cosa seme-
jante. Para que exista abuso de discreción, o debe aparecer
terminantemente de los autos que se ha cometido alguna in-
justicia con el acusado, o ser ésta una inferencia necesaria
de los autos. No encontramos ni una ni otra cosa.

Este fué un caso en que dos bandos, uno compuesto de
socialistas y republicanos al cual pertenecía el acusado y
otro compuesto de unionistas tuvieron un encuentro en la
carretera. Alvarado, supuesto lider de los unionistas fué

muerto y hubo prueba de testigos oculares tendentes a acreditar que el apelante disparó a Alvarado y que de la herida resultante falleció éste. Cada uno de los grupos acusa al otro de haber promovido la perturbación. Existía alguna prueba de que el grupo unionista trataba de interceptar el paso. Hubo otra prueba de que ambos grupos viajaban en automóviles y de que ninguno se sometería al otro, si bien al principio se trató de llegar a cierto entendimiento. Alguien empezó a disparar y luego se hicieron varios disparos. Era al parecer más o menos una batalla campal. Hubo prueba que no fué refutada de que Alvarado disparó y mató a otro hombre, pero la prueba del gobierno tiende a establecer que él sacó su revolver y sólo disparó después de haber sido herido; que disparó en retirada. La prueba de la defensa era que Lanausse no disparó el tiro que causó la muerte a Alvarado; que el acusado no portaba ningún arma y si bien algunos de los testigos del acusado dicen que el acusado estaba cerca del sitio de los sucesos, que no se encontraba presente en el lugar inmediato en que tuvo lugar el disparo. La teoría de la defensa fué que Lanausse no disparó el tiro que mató a Alvarado. Los testigos del gobierno dicen que el acusado disparó el primer tiro. La defensa presentó cierta prueba tendente a probar que fué Alvarado quien disparó primero. Un testigo del gobierno, un policía, declaró que el acusado había dicho o admitido que había disparado al grupo unionista porque ese grupo había disparado al grupo donde estaba el acusado.

El acusado pidió a la corte que diera al jurado la instrucción que sigue, la cual fué negada por la corte:

"Si los señores del jurado entienden que Luis Alvarado fué muerto o recibió el balazo que le produjo la muerte en momentos en que pretendía asesinar o inferir grave daño corporal a alguna persona o de cometer algún delito grave, el balazo que él recibió allí y entonces estaba justificado por la persona que lo produjera."

El apelante alega como error la negativa de la corte a dar esta instrucción.

Convenimos con el apelante en que no importa cual fuera la teoría inicial de la defensa si aparecieran hechos en el juicio tendentes a probar un homicidio justificable, un acusado tiene derecho a que se dé una instrucción que permita al jurado, de dar crédito a los hechos, absolverlo legalmente. En un caso de homicidio una vez demostrado que el acusado hizo el disparo el acusado tiene por lo menos el deber de mostrar a la corte que hay alguna prueba real tendente a establecer que el homicidio que de otro modo sería un homicidio involuntario era justificable. Decimos ''prueba real'' y con ello queremos decir que no es bastante con que la prueba revele meramente la posibilidad de que el acusado disparó justificadamente. Sostiene el apelante que hubo prueba tendente a mostrar que Alvarado estaba disparando al grupo contrario y hubo prueba de que el acusado disparó en contestación, e invoca el artículo 209 del Código Penal el cual prescribe lo siguiente:

''Artículo 209.—Podrá también justificarse el homicidio cuando lo cometiere alguna persona en cualquiera de los casos siguientes:

''1. En el acto de resistir o impedir la tentativa de asesinar o de inferir grave daño corporal a alguna persona, o de cometer algún delito grave (*felony*).

''2. Cuando se comete al defender una morada, propiedad o persona contra alguno que manifiestamente intente o procure, por medio de violencia o sorpresa, cometer cualquier delito grave (*felony*) o que violenta, desordenada y tumultuosamente intente o procure penetrar en la morada de otro con el propósito de agredir a alguna persona que se hallare en ella.

''3. Cuando se comete en legítima defensa de dicha persona, o de la esposa o esposo, padre o madre, hijo, amo o sirviente de tal persona, siempre que hubiere motivos fundados para sospechar que existe el propósito de cometer un delito grave (*felony*) o de inferir grave daño corporal, o inminente riesgo de que tal propósito se realice; pero dicha persona, o la persona cuya defensa se intentare,

si fuere el agresor o estuviere empeñada en lucha mortal, deberá tratar de desistir de ella, antes de cometerse el homicidio.

"4. Cuando hubiere necesidad de cometerlo, al intentar por medios legítimos, la prisión de algún reo de delito grave (*felony*) o al procurar legalmente mantener el orden público."

Pero no hay prueba en los autos que acredite que el acusado disparó para impedir la comisión de un delito grave (*felony*) o en defensa de otra persona. Yendo aún más lejos podemos decir que en los autos no hay circunstancias de las cuales deba razonablemente inferirse tal conclusión. No hay la más leve prueba que indique que el acusado disparó a Alvarado o a alguna otra persona en el grupo unionista para impedir que se siguiera disparando. Su propia alegada admisión indica que él disparó en contestación, pero no que nadie se encontraba en peligro. Si un hombre dispara contra otro el acusado legalmente no tiene derecho a disparar contra el primero a menos que el disparo que se contesta sea para impedir un acto prohibido por la ley. No solo no hubo prueba de tal disparo justificado, sino que la misma instrucción solicitada es defectuosa por omitirse en ella elementos que son necesarios. El mero hecho de que un hombre esté cometiendo un asesinato u homicidio no justifica que se le de muerte a menos que se matara para impedir la comisión de un delito grave (*felony*) o algún acto por el estilo. No puede matarse a una persona porque esté para cometer un delito grave (*felony*), sino para impedir su comisión. Con frecuencia, por ejemplo, un policía dispara a una persona para impedir la comisión de un *felony* y que tal era su propósito aparecerá generalmente. Un hombre no puede justificadamente contestar un disparo por venganza. La manifestación de Lanausse de que él contestó el disparo no muestra ningún fin, por no decir ninguna excusa. *Non constat* que él disparó a personas no combatientes del grupo unionista.

Desde luego que de haber habido alguna prueba tendente

a mostrar que Lanausse disparó en defensa propia, una si-
tuación diferente hubiera surgido. En el caso de *El Pueblo*
v. *Sutton,* 17 D. P. R. 345, examinamos el alcance del artículo
209, y entre otras cosas aprobamos la declaración hecha en
el caso de *People* v. *Glover,* 141 Cal. 233, de que una persona
puede repeler fuerza a la fuerza en defensa de su persona,
propiedad o vida, contra uno que claramente intenta o pre-
tende por la violencia o sorpresa cometer un conocido delito
menos grave (*misdemeanor*) o delito grave (*felony*), o cau-
sar grave daño corporal a su persona, y el daño que justi-
ficaría al acusado a ejecutar el acto del cual se le acusa,
puede ser real o aparente, y el jurado no ha de considerar
si el acusado estaba en verdadero peligro de su vida o pro-
piedad, sino solo si las indicaciones eran tales que inducen
a una persona razonable a creer que había tal peligro para
su persona o propiedad.

El error restante que se discute se refiere a la exclusión
de cierta prueba. Se preguntó a un testigo sobre la repu-
tación de Alvarado como persona peligrosa y fué excluída
la prueba en efecto porque no hubo prueba de defensa pro-
pia. Véanse los casos de *El Pueblo* v. *Sutton,* 17 D. P. R.
345; *El Pueblo* v. *Barrios,* 23 D. P. R. 831. Como no en-
contramos ninguna prueba de defensa propia o de un homi-
cidio justificable no vemos que se haya cometido error.

La sentencia apelada debe confirmarse.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente del Toro y Aso-
ciados Aldrey y Hutchison.

El Juez Asociado Sr. Franco Soto no intervino en la
vista de este caso.